641 A.2d 618

### Frank SCHALL

v.

### SANDY TOWNSHIP, a municipal corporation and CITY OF DUBOIS, a municipal corporation,

### Appeal of CITY OF DUBOIS, Appellant.

Commonwealth Court of Pennsylvania.

Argued Feb. 28, 1994.

Decided April 13, 1994.

Toni M. Cherry, for appellant.

Robert M. Hanak, for appellee Frank Schall.

Gregory M. Kruk, for appellee Sandy Tp.

Before SMITH and NEWMAN, JJ., and KELTON, Senior Judge.

KELTON, Senior Judge.

In this equity action brought by Frank Schall (Schall) against the City of DuBois and the Township of Sandy, the Court of Common Pleas of Clearfield County (trial court) ordered the City to comply with a 1988 Guaranty and Service Agreement (Agreement) between the City and the Township and grant Schall access to the City's sewer system for his proposed 88–lot subdivision in the Township. The City appeals from the April 1, 1993 order of the trial court denying the City's October 22, 1992 post-trial motions to set aside the injunction. We affirm.

On November 7, 1991, Schall filed his complaint seeking injunctive relief against the City and the Township and alleging that the two municipalities had refused to grant his subdivision access to the City's sewage system and treatment plant. Schall, a township resident and land developer, could not obtain a commitment from the Township for sewage treatment because the Township in turn could not receive a commitment from the City to serve Schall's property under the Agreement between the two municipalities.

In the preamble to the Agreement, the parties related that the City had been treating township sewage at the City's treatment plant; that the City had been ordered to upgrade the plant; that the City had commenced construction of

improvements to its system; that it had accepted state and federal government grants-in-aid of construction totalling $2,500,000.00; and that the City would finance the balance of the costs with $2,830,000.00 borrowed from local banks to be repaid by long-term financing through the Pennsylvania Infrastructure Investment Authority.

Article I of the agreement then provided in part:

### SERVICE COVENANT—TERM OF CONTRACT

The City agrees to continue to receive and treat the sanitary sewage of all public, domestic, commercial, industrial and other sewered properties of the Township at the City's Sewage Treatment Plant, located in the Township, and covenants with the Township that it will finance, acquire, construct and complete its 1988 Sewage Treatment Plant Improvement Project as soon as practicable in accordance with the final plans and specifications of its Consulting Engineers, The Chester Engineers, Inc., of Coraopolis, Pennsylvania, and in conformity with law and all requirements of all governmental authorities having jurisdiction thereover. The City further covenants that, upon approval of additional customers in the Township by the City, which approval shall not unreasonably be withheld, and subject to the sewage treatment service rules and regulations of the City, the City will render sewage treatment service to all such additional customers which may from time to time connect directly or indirectly to the City's Sewage Treatment Plant.

. . . .

The City covenants and agrees that it will reserve exclusively to the Township an additional 400,000 gallons per day of capacity at the City's Sewage Treatment Plant for future expansion of the Township's sewer system in the existing service area within the Township.

(R.R. 291a, Article I, first and third paragraphs.)

In paragraph 8 of his complaint, Schall alleged that the Sandy Township Planning Commission had already approved

his subdivision. He averred in paragraph 9 that the Clearfield County Planning Commission, which must render final approval, had not done so due to the lack of municipal sewage in the subdivision. He testified at the March 10, 1992 hearing that the City had given his subdivision water-tap approval sometime in 1990. (R.R. 6a.)

Schall further alleged that the actions of the City and the Township in refusing to provide his subdivision with sewage treatment "have rendered Plaintiff's real estate inalienable in such manner that lots cannot now be sold until such time as sewage is provided, if ever." Paragraph 17 of Schall's Complaint. He also averred that he offered to correct "any lines of [the City and the Township] in which Plaintiff will connect that have present infiltration and diminished capacity, which offer by the Plaintiff has been refused by [the City and Township]." Paragraph 18 of Schall's Complaint.

On October 14, 1992, after hearing, the trial court (1) entered judgment in favor of Schall and against the City; (2) enjoined the City from further breach of the Agreement between the City and the Township; (3) directed the City to provide Schall with his requested sewage disposal; and (4) in all other respects, entered judgment in favor of the City.

In its October 22, 1992 post-trial motions, the City alleged that the trial court erred in (1) finding that Schall had standing to bring suit under the Agreement between the City and the Township; (2) interpreting the 1988 Agreement; and (3) declining to rule on the City's preliminary objections prior to trial.

### Issues

There are three issues preserved for review: 1) whether the trial court erred in concluding that Schall had standing to sue the City; 2) whether the trial court erred in requiring the city to accept Schall's sewage; and 3) whether the trial court erred in not deciding the City's preliminary objections prior to trial.

■ Our scope of review here is limited to determining whether the trial court abused its discretion or committed an error of law. *Sullivan v. County of Bucks,* 92 Pa.Common-

wealth Ct. 213, 499 A.2d 678 (1985), *petition for allowance of appeal denied,* 516 Pa. 623, 532 A.2d 21 (1986).

## 1. Standing

■ Holding that Schall had standing to bring his action against the City, the trial court noted that the Township and its residents must rely on the performance of the City under the terms of the contract for satisfactory sewage disposal. Also, the court considered the fact that the Township, the party who contracted with the City for sewage treatment and agreed to forego operating a sewage treatment facility, joined in and ratified Schall's legal position. Citing *Sullivan v. County of Bucks,* 92 Pa.Commonwealth Ct. 213, 499 A.2d 678 (1985), the trial court concluded that Schall had standing to bring his action as a township resident and a developer of land therein.

*Sullivan* involved "challenges to the construction of facilities to supply water for cooling a nuclear generating station in Limerick, Montgomery County . . . and meeting the citizens' requirements of Bucks and Montgomery Counties." *Id.* at 216, 499 A.2d at 681–82. On appeal to the Commonwealth Court, Bucks County and the Neshaminy Water Resources Authority (NWRA) contended that the trial court erred in determining that the Philadelphia Electric Company (PECO) and the North Penn (NP) and North Wales (NW) Water Authorities had standing to enforce interrelated agreements. One agreement between PECO and NWRA related to the construction and operation of a complex water-supply system. The second agreement between the two counties and NWRA provided for the allocation of agreed upon shares of the water for the benefit of each of the respective counties. The NP and NW Authorities were not specifically mentioned in either agreement.

We analyzed the *Sullivan* parties' standing under the test for determining third-party beneficiaries which was set forth

by our Supreme Court in *Guy v. Liederbach*, 501 Pa. 47, 459 A.2d 744 (1983): [1]

> There is thus a two part test for determining whether one is an intended third party beneficiary: (1) the recognition of the beneficiary's right must be 'appropriate to effectuate the intention of the parties,' and (2) the performance must 'satisfy an obligation of the promisee to pay money to the beneficiary' or 'circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.'

With respect to the Water Sales Agreement, we concluded that the contracting parties mutually intended as manifested in their agreement that PECO would benefit as a major water purchaser and that NP and NW were to be beneficiaries of Montgomery County's water purchase, especially since Montgomery County itself had no direct interest. With respect to the Construction and Operation Agreement, we determined that "the parties *mutually intended*, as *manifested* in the agreement, that NP and NW would be beneficiaries" and that "the promisee (PECO) intended to give them the benefit of the promised performance." *Sullivan*, 92 Pa.Commonwealth Ct. at 227, 499 A.2d at 686–87 (Emphasis in original) (footnote omitted).

Here, the City argues that *Sullivan* is distinguishable because the *Sullivan* parties (NP and NW) who were found to be third-party beneficiaries were all contracting parties in separate agreements with Montgomery County while, here, Schall was not a party to the 1988 Agreement at issue. The City, however, misconstrues the status of the parties in *Sullivan*.

1. In an earlier decision, *Spires v. Hanover Fire Insurance Co.*, 364 Pa. 52, 70 A.2d 828 (1950), our Supreme Court stated that, in order for third-party beneficiaries to recover on a contract, both parties to the contract must so intend and must indicate that intention in the contract. In *Sullivan*, we noted that our Supreme Court in *Guy* overruled *Spires* at least "to the extent that it states the *exclusive* test for third party beneficiaries." *Sullivan*, 92 Pa.Commonwealth Ct. at 225, 499 A.2d at 686 (Emphasis in original).

NP, NW and PECO were not signatory parties to the water allocation agreement, but instead, only third-party beneficiaries. NP and NW were beneficiaries of Montgomery County's water purchase and PECO was to be a major water purchaser. We find it irrelevant, except for the purpose of identifying third-party beneficiaries, that NP and NW entered into contracts for water with Montgomery County simultaneously with the execution of the Water Sales Agreement between Montgomery and Bucks Counties. That would not make NP and NW signatory parties to the Water Sales Agreement; it is merely strong indicia that NW and NP were indeed third-party beneficiaries of that agreement. Thus, we disagree with the City's attempt to distinguish *Sullivan* on that basis.

The City also argues that the trial court erred in determining that Schall had even third-party beneficiary status because he did not live in the Township within the area served by the City's sewage system at the time the 1988 Agreement was signed and there was no other identifiable body within the Township to be benefitted by the Agreement, other than those who were residents at that time.

Article I of the Agreement, paragraph 2, provides in relevant part as follows:

> The Township agrees that the City shall be the sole and exclusive agency during the entire life of this 1988 Guaranty and Service Agreement to provide sewage transportation and treatment service *to the Township for such portion or portions thereof as are within the service area of the City's Sewer System,* and to all sewered properties therein. The term 'service area' shall mean all that area that can presently be served by gravity by the Sewer System of the City, the subject of this 1988 Guaranty and Service Agreement.

(R.R. 291a) (Emphasis added).

Here, there is an even stronger case for affording Schall standing than there was in *Sullivan.* Under the terms of the Agreement, it is to be in effect until December 31, 2009. (R.R. 292a.) It would be absurd to interpret the relatively long-term Agreement to mean that new residents who moved

to the area after 1988 would not be intended beneficiaries of the Agreement.

Also, it would be illogical to assume that the Agreement did not cover residents of the Township living within the service area covered by the Agreement. Here, neither party disputes that the place where Schall wishes to connect to the line is gravity flow. By definition, Schall would be within the "service area" as defined in the Agreement. (R.R. 291a.)

Finally, we hold that to deny standing to a property owner who is in the service area and who needs the promised sewer service defies common sense. The property owners in the City and Township have the most direct interest in having the Agreement enforced. The trial court did not err in determining that Schall had standing.

## 2. Trial Court's Interpretation of the 1988 Agreement

The trial court concluded that "the 1988 agreement between Sandy Township and the City of DuBois guarantees to the Township 400,000 gallons of sewage treatment per day."[2] Trial Court's Opinion at 2. There is evidence in the record to support that finding at R.R. 43a. The court stated that "[t]he record is clear that the Township does not now reach this amount of treatment." *Id.* There is also evidence in the record to support that finding. (R.R. 44a, 220a.)

The court further "found as a fact from the record and testimony that the problems [in the sewage system] were created by lack of proper maintenance and repair and that if properly kept, the subject line would be more than adequate to handle [Schall's] additional sewage." Trial Court's Opinion at 2–3. Thus, the court concluded that "the City of DuBois was obligated under the terms of its contract with Sandy Township to grant [Schall] the right to tap into the system." *Id.* at 3.

■ The City argues that the trial court erred in interpreting the Agreement because, under Article I, the City is not

2. In fact, the Agreement provides for "an additional 400,000 gallons per day ... for future expansion ... in the existing service area within the Township." (R.R. 291a.)

obligated to extend its service area and to provide the requested sewer taps to Schall unless approval has been given following an engineering study. Further, the City contends that, based on Articles VII and VIII of the Agreement, it may refuse extensions if the sewer system does not have adequate capacity. (R.R. 227a.)

Schall argues that, although he was not being served with sewer in 1988, he is within the existing service area because his development "can presently be served" within the promised 400,000 gallon-per-day allotment to the Township. According to Schall, "existing service area" refers to those Township users who were served by City sewer in 1988 *plus* any additional Township customers who do not exceed the 400,000 gallon-per-day limit. Thus, Schall contends that the provisions of the Agreement cited by the City, requiring approval for additional service area only after agreement and an engineering study, only apply when future Township customers wish to connect to the sewer and the 400,000 gallon-per-day limit has been reached. We agree.

The pertinent portion of Article I of the Agreement provides as follows:

If the Township and the City determine that it is feasible or desirable to add to the existing service area, on a written supplemental agreement of the Township and the City, they may add to such existing service area such additional service area as they mutually deem appropriate; provided, however, that such quantity of sewage added shall not exceed the capacity of the Sewer System of the City, subject to the prior determination of such capacity by the City and its Consulting Engineers. The Township covenants that it will not itself engage in the business of providing sewage treatment service to such sewered properties as are within the existing service area, nor will it individually or jointly authorize or permit any other agency, public or private, to do so, in competition with or in substitution for the City.

(R.R. 291a, Article I, second paragraph.)

Thus, under the Agreement, the approval and engineering study requirements come into effect *only* when an addition to

the existing service area is at issue, not when someone who can presently be served by the system is seeking connection. Accordingly, we conclude that, because it is undisputed that Schall is within the existing service area that can presently be served by gravity, the City is obligated under the Articles I and VII of the Agreement not to unreasonably withhold permission to make the connections. (R.R. 297a.)

### 3. Preliminary Objections

On November 26, 1991, the City filed preliminary objections to Schall's November 7, 1991 complaint for injunctive relief. After a hearing was scheduled for February 14, 1992, the City filed a motion for continuance of the hearing on February 13, 1992, therein alleging that it had not yet filed an answer because its preliminary objections were outstanding and Schall had not yet provided it with his expert report in sufficient time for the City to prepare for trial. (R.R. 344–46a.)

On February 13, 1992, the trial court granted the motion and rescheduled the hearing for March 10 and 11, 1992. The trial court did not rule on the preliminary objections prior to the March 10, 1992 hearing.

■ The City argues that it was prejudiced by the trial court's failure to rule on its preliminary objections prior to the hearing because it was denied the right to file an Answer where it could have denied various allegations of the complaint. Thus, the City contends that the trial court violated Pa.R.C.P. No. 1028(c)(2), which provides as follows:

(2) The court shall determine *promptly* all preliminary objections. If an issue of fact is raised, the court shall consider evidence by depositions or otherwise.

Pa.R.C.P. No. 1028(c)(2) (Emphasis added).

At the hearing, however, the City was able to delve into its preliminary objections by asking questions related to Schall's standing (R.R. 18–19a) and about the Agreement itself (R.R. 56–66a). Given the City's seeming acquiescence to the hearing as evidenced by its full participation, the absence in the transcript of any protest against having the hearing, its apparent failure at the hearing to raise the trial court's failure to

rule on the preliminary objections, failure to seek leave of court to file responsive pleadings and the absence of any proven or perceived prejudice, we conclude that, if the trial court erred, it was harmless.

Also, we note that the only issue raised in the City's preliminary objections was that Schall lacked standing because he was not a party to the contract and not a resident of the City. Those issues were in fact preserved for review and have been dealt with here. This litigation was first commenced on November 7, 1991. The trial judge required Schall to meet the burden of presenting his evidence and persuading the fact finder. In effect, he treated all of the averments of the complaint as denied. We see no need to delay the final resolution of this matter any longer. *See Dream Pools of Pennsylvania, Inc. v. Baehr*, 326 Pa.Superior Ct. 583, 474 A.2d 1131 (1984) (holding that a procedural error that did not affect the substantive rights of the parties should be disregarded as harmless and nonprejudicial).

## Conclusion

For the above reasons, we affirm.

## *ORDER*

**AND NOW**, this 13th day of April, 1994, the order of the Court of Common Pleas of Clearfield County dated April 1, 1993 at No. 91–18–Equity is hereby affirmed.